# EXHIBIT 4

FD-302 (Rev. 5-8-10)  - 1 of 7 -  

## FEDERAL BUREAU OF INVESTIGATION

Date of entry    09/07/2016

Matthew Gutwein ("Gutwein"), president and CEO of Health and Hospital Corporation of Marion County (HHC), was interviewed at the U.S. Attorney's Office located at 10 West Market Street, Indianapolis, Indiana. Present on Gutwein's behalf were attorneys Dave Hensel and Tavonna Harris Askew. Representing the Government were Assistant U.S. Attorneys (AUSA) Nick Linder and Cindy Cho, along with FBI Special Agents Joseph Weston and Victoria Madtson. AUSA Linder explained to Gutwein that he needed to tell the truth and that the Government's investigation was separate from American Senior Communities' (ASC) own internal investigation. Gutwein acknowledged that he understood and provided the following information:

### Background of HHC/ASC Relationship

Gutwein was the chairperson of HHC's board of directors when HHC's relationship began with ASC. Doug Elwell ("Elwell") was HHC's CEO at that time, and Elwell was the primary person who got the relationship going. A large part of HHC's mission is to provide care for indigent and under-served people. The demand for care for this group of people exceeds the available funding, which is primarily Medicaid and Medicare. In 2002, Wishard Hospital was close to economic collapse, losing about $10 million per month. Gutwein and the other board members spent a lot of time trying to figure out a way to keep Wishard open. Elwell examined ways to bring in more resources, and he learned about an opportunity to access additional Medicaid/Medicare funds in connection with the Upper Payment Limit program (UPL) and HHC's long-term care program. The opportunity would allow HHC to earn excess Medicaid/Medicare revenue by efficiently running long-term care facilities throughout Indiana. At the time, HHC had only one senior care home, which was the Lockfield Gardens facility connected to Wishard Hospital.

HHC worked on a plan with the state and talked with multiple nursing home operators. HHC worked with Crowe Chizek ("Crowe," later to become Crowe Horwath) to identify a good operator. The suggestion for HHC to use ASC may have come from Crowe. HHC had a lot of respect for the Jackson family. The Jacksons were an Indiana-based family with a long history in the long-term care industry. The Jacksons had a good track record and they had a reputation of being honest. In Gutwein's words, the Jacksons were

---

Investigation on  04/18/2016  at  Indianapolis, Indiana, United States (In Person)

File #  318A-IP-6430055                                       Date drafted  07/05/2016

by  Joseph P. Weston, Victoria G. Madtson

FD-302a (Rev. 05-08-10)

318A-IP-6430055

Continuation of FD-302 of (U) Interview of Matt Gutwein on 04/18/2016 , On 04/18/2016 , Page 2 of 7

"good people" and "good business operators." At one time, the Jacksons had owned a chain of hospitals known as Basic American.

Alan Rachels was HHC's point of contact at Crowe. He is retired and may have passed away.

Elwell negotiated the very first agreements with ASC. Jim Burkhart ("Burkhart") was ASC's CEO at the time and was always present at the negotiation meetings with Ethan Jackson ("Ethan") and Frank Jackson ("Frank"). Gutwein took over the role of CEO at HHC soon after the initial agreements with ASC were executed.

HHC initially purchased 12 nursing homes. The plan was to purchase more nursing homes if business was good, with a goal of 50 nursing homes. At the time, the majority of Gutwein's time was spent on the issues with Wishard Health Services.

Having only one operator was not a deliberate decision made by HHC. Over the years, HHC has entertained proposals from operators other than ASC; however, these other operators just wanted to partner with HHC in order to get access to the UPL. They were not interested in improving the quality of their facilities or the care they offered their residents. HHC was not interested in these operators.

**Gutwein's Relationship With Burkhart**

Gutwein did not have a lot of conversations with Burkhart, nor did he have regular meetings with him. At first, HHC's CFO Dan Sellers ("Sellers") and Chief of Staff Patty Hebenstreit ("Hebenstreit") met with ASC on a regular basis, which included Burkhart. Gutwein occasionally sat in on these meetings. Gutwein had asked Sellers and Hebenstreit to manage HHC's relationship with ASC.

HHC established the following expectations with ASC: that the HHC-ASC relationship would benefit the nursing home residents, that employees would be taken care of (e.g., access to health insurance and career ladders), that and facilities would be taken care of. HHC decided that it would voluntarily pay property taxes on its long-term care facilities to contribute to the local communities. HHC challenged Burkhart to suggest other initiatives HHC could undertake within long-term care.

Early on, Gutwein saw Burkhart at HHC's Long-Term Care Committee meetings (which were previously called Planning Committee meetings). Eventually Dan Benson ("Benson") started to attend the meetings instead of Burkhart. Overall, Gutwein did not see Burkhart very much. The two did not have a personal relationship. Gutwein never joined Burkhart in any personal

FD-302a (Rev. 05-08-10)

318A-IP-6430055

Continuation of FD-302 of (U) Interview of Matt Gutwein on 04/18/2016 , On 04/18/2016 , Page 3 of 7

dinner or golf outings, nor did he ever visit Burkhart's home. Gutwein invited Burkhart to political fundraisers, which Burkhart sometimes attended. These events involved large groups of attendees.

**Role of Sellers & Hebenstreit**

Sellers was responsible for overseeing the finances of HHC's long-term care program. He was also responsible for overseeing HHC's relationship with ASC. Gutwein and Sellers met together to make sure the nursing homes were being operated efficiently. Gutwein describes Sellers as a capable, competent, independent, motivated, and responsible CFO.

Initially, Hebenstreit was responsible for overseeing the operations of the nursing homes. HHC hired Crowe to assist with the oversight of the homes. Shelia Guenin ("Guenin") worked for a firm that was subcontracted by Crowe to assist with the quality audits of HHC's nursing homes, which included inspections. Eventually HHC purchased Guenin's firm and brought it in-house, including Guenin.

**2010 Indianapolis Star Newspaper Article**

The article published about HHC in 2010 by the Indianapolis Star made HHC look bad as the result of incorrect data that was pulled for the story by an employee of Indiana's Department of Health. Burkhart, Gutwein, Sellers, and Guenin had meetings with representatives of the newspaper about the article, and eventually the editor apologized to Gutwein.

**Quality of Care**

Gutwein was asked by the interviewers if HHC put more money into its nursing homes as a result of the bad press from the aforementioned newspaper article. He responded that around the same time the article came out, HHC's quality scores dipped after HHC purchased a large group of nursing homes. Burkhart's strategy was to move ASC's best administrators to the newly-acquired homes; however, the strategy did not work very well, because the quality at the administrators' previous and new homes dipped. As a result, a new plan was developed which created a group dedicated to supporting the administrators at the new homes, instead of treating the new homes like HHC's existing homes.

HHC has always been focused on improving the quality of resident care. For instance, HHC worked with ASC to experiment with having a registered nurse available 24 hours per day, 7 days per week, at the nursing homes. The trial was considered a success. As previously noted, HHC challenged Burkhart to come up with ideas that would result in greater building quality and patient satisfaction. HHC's charge to Burkhart was something to

318A-IP-6430055

Continuation of FD-302 of (U) Interview of Matt Gutwein on 04/18/2016 , On 04/18/2016 , Page 4 of 7

the effect of, "Jim, come up with ideas that will result in these homes being better," and, "Make these homes the best they can possibly be."

### Capital Expenditures

HHC was okay with its capital expenditures for improvements at the nursing homes being higher than the state average, because the money was spent in meaningful ways that resulted in well cared for homes. HHC would not have been okay with someone stealing from HHC. HHC wanted homes that were good for the community; homes that both patients and employees would be proud of. At times, HHC's nursing home capital expenditures were approximately three times the state average. As a result, Gutwein and other members of HHC's management did not view the high amount of capital expenditures as a red flag.

ASC showed before and after photos of the homes at HHC's board meetings.

It is Gutwein's understanding that the profits earned by other nursing home operators go back to the owners rather than reinvested into the homes. This is not the case with HHC, because HHC is a not-for-profit entity. Gutwein is more concerned with HHC making a difference in the lives of residents than making money.

Sellers and Guenin participated in the initial conversations with Burkhart about the installation of new generators at the nursing homes. Gutwein also discussed the generators with Sellers and Gutwein. Burkhart brought up large capital projects, such as the generators, to Gutwein in passing conversations. These conversations were not strategic in nature. Burkhart was proud of how the projects were progressing.

### ASC's Management Fee

HHC paid ASC a management fee of 5 to 5.5 percent. He thought this was a fair fee, not abnormal for the industry.

### ASC Procurement Process

Gutwein, Sellers, and Guenin occasionally discussed ASC's procurement procedures. ASC was not required to follow the governmental procurement procedures that HHC followed. HHC expected ASC/Burkhart to follow a procurement process that would lead to the best results. Gutwein specifically recalls talking to Sellers about how Sellers told Burkhart to obtain multiple bids for large projects, such as the generators. The generator project was approximately $10 million. Sellers told Gutwein that Burkhart had told him that he had obtained three bids for the large projects.

FD-302a (Rev. 05-08-10)

318A-IP-6430055

Continuation of FD-302 of  (U) Interview of Matt Gutwein on 04/18/2016 , On 04/18/2016 , Page 5 of 7

    HHC encouraged Burkhart to seek diversity in the selection of ASC's vendors. Sellers was the person who discussed vendor diversity with Burkhart. Gutwein never told Burkhart to use a single or specific vendor.

    Gutwein was not aware of Burkhart having financial interest in any companies/entities that did business with ASC/HHC, other than Crusader (discussed in more detail below). Gutwein would have never expected it since it would have created a conflict of interest. It would have had to be disclosed to HHC, and Gutwein would not have approved it unless there were extenuating circumstances and appropriate checks and balances. Gutwein was shocked to learn about Burkhart's side businesses that dealt with ASC; HHC would have shut that activity down.

**Jackson Family**

    When HHC purchased its first 12 nursing homes, Gutwein knew that the Jackson family owned the pharmacy, Cornerstone, that served them. Gutwein did not like it, but he knew that it was common in the industry. After September 15, 2015, Gutwein learned about two additional companies, Midwest Radiology and a construction company, that were owned by the Jackson family and had been doing business with ASC.

    The difference between Burkhart's side businesses and the companies owned by the Jacksons is that Burkhart's businesses received an inflated amount for providing no services. Also, the Jackson-owned pharmacy was disclosed to HHC.

    Any discounts provided by vendors as a result of ASC's additional bargaining power should go to HHC. If Burkhart would have disclosed the side deal arrangements to HHC, he would have been told that he could not conduct them.

    Burkhart was an employee on ASC and therefore was not allowed to create side deals with vendors of ASC.

    Gutwein did not know that Pharmakon was ASC's pharmacy vendor until after September 15, 2015.

**Steve Ganote**

    Gutwein met Steve Ganote ("Ganote") on a few occasions prior to September 15, 2015. Gutwein invited Burkhart to fundraisers, and Ganote sometimes attended the fundraisers with Burkhart. There was also a time when Burkhart invited Gutwein to a lunch meeting with Indianapolis Mayor Greg Ballard at the Skyline Club. Ganote was also present at the lunch meeting. Gutwein thought that Ganote was just Burkhart's friend, not a

FD-302a (Rev. 05-08-10)

318A-IP-6430055

Continuation of FD-302 of (U) Interview of Matt Gutwein on 04/18/2016 , On 04/18/2016 , Page 6 of 7

business associate. Gutwein never heard Ganote say that he did work on behalf of ASC. If ASC engaged a broker to help ASC work out deals, Gutwein would not have been involved and the costs associated with the broker would have been borne by ASC.

**Legacy Projects**

"Legacy projects" were the projects such as the generators, nurse call light systems, and electronic medical records that were meant to leave a lasting impression on HHC's nursing homes. Gutwein did not have conversations with Burkhart about these projects; rather, Gutwein discussed them with Sellers and Guenin. He was not involved in the execution of the legacy projects.

**Put Agreements**

The idea of the put agreements came about when HHC was considering getting into the long-term care business. Elwell was not as risk averse as Gutwein, and in conversations between the two, Gutwein said that HHC needed an exit strategy to save Marion County tax payers if it went wrong. Elwell came up with the "put" terminology. Gutwein viewed the put agreements like an insurance policy which gave HHC the ability to exit the long-term care industry. The puts also incentivized the Jackson family to take care of the buildings, since they would have to take them back if the puts were exercised. HHC worked with the Jacksons on the put agreements, which were part of the purchase deal for the first 12 nursing homes. Gutwein wanted to have puts on all of the homes.

Burkhart became involved in the put agreements when the Omega REIT purchased the underlying real estate of some of the homes operated by HHC. Burkhart told HHC that the Jacksons wanted to sell the real estate and get out of the associated put agreements. Burkhart said that he would assume the puts by creating a company called Crusader which would bear the risk. Gutwein heard this from Sellers, who had heard it from either Burkhart or attorney Brian Fennerty ("Fennerty"). The puts also incentivized Burkhart to run the homes well. After September 15, 2015, Gutwein learned the Jacksons told a different story about the details of Burkhart's assumption of the puts.

HHC thought that the put agreements provided good value for HHC.

**Burkhart & HHC-ASC Management Agreement**

When asked by the interviewers why Burkhart was written into the HHC-ASC management agreement, Gutwein stated that it was his understanding that Frank and Ethan did not trust their children to run the Jackson family

FD-302a (Rev. 05-08-10)

318A-IP-6430055

Continuation of FD-302 of (U) Interview of Matt Gutwein on 04/18/2016 , On 04/18/2016 , Page 7 of 7

business well. Burkhart said that he was like another son of the Jacksons, but that he had the interest and competence to run ASC. There was a concern that the Jackson children could kick Burkhart out; Burkhart said that Frank and Ethan wanted to put a structure in place to keep it from happening. Gutwein gained his understanding of the reasoning behind the management agreement from Burkhart and Fennerty. Gutwein did not verify with the Jacksons what Burkhart told him in this regard.

**Other**

Gutwein trusted Burkhart. Quality measures such as patient and employee satisfaction went up under Burkhart's leadership, and the nursing homes were economically successful. Burkhart seemed to always do what HHC asked him to do.

Benson seemed like a decent, kind person. He adopted two kids from Ethiopia with AIDS. Gutwein thought Benson was a great example the staff of ASC could look up to.

Gutwein did not know that the Jackson family had wanted to meet with HHC until after September 15, 2015. Gutwein saw Blake Jackson periodically in connection with some foundation work. He never mentioned that members of his family wanted to meet with HHC. Gutwein did not have the impression that anyone prevented the Jackson children from interacting with HHC.

It was Gutwein's understanding, after September 15, 2015, that during the last few years, Fennerty acted as both HHC's and ASC's lawyer in deals. Gutwein thought it was odd that ASC did not have its own lawyer. Gutwein does not know who Burkhart/Crusader's lawyer is or was.

Burkhart's actions have been highly disruptive to ASC and HHC. ASC still lacks a permanent CEO and COO, and the future of the company is not secure. As a result, it has been difficult to maintain morale at ASC. HHC as a whole is also at risk because it could lose its ability to bill Medicaid and Medicare. More than half of the residents of Marion County have received care at Eskenazi Hospital.

An indemnification agreement could bankrupt ASC, and if ASC goes out of business, HHC will have to look for another operator for its nursing homes. A new operator would likely be a private, for-profit company that is out of state.