# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JAMES BURKHART, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-04013-TWP-DLP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| BARNES & THORNBURG LLP, | ) | |
| | ) | |
| Interested Party. | ) | |

## ENTRY DENYING MOTION FOR RELIEF PURSUANT TO 28 U.S.C. § 2255, DENYING REQUEST FOR EVIDENTIARY HEARING, AND GRANTING CERTIFICATE OF APPEALABILITY

This matter is before the Court on Petitioner James Burkhart's ("Burkhart") Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a Person in Federal Custody.  (Dkt. 1.)  In 2018, Burkhart pled guilty to Conspiracy to Commit Mail, Wire, and Health Care Fraud, Conspiracy to Violate the Anti-Kickback Statute, and Money Laundering, and he was sentenced to a total of 114 months imprisonment for these convictions. *United States v. Burkhart*, Case No. 1:16-cr-00212-TWP-TAB ("Crim. Dkt.") (Crim. Dkt. 287.) He seeks relief from his convictions and sentence because his defense attorneys operated under an actual conflict of interest that adversely affected his defense.  For the reasons explained in this Entry, Burkhart's Motion must be **denied** and the action dismissed with prejudice.  In addition, the Court determines that a certificate of appealability should issue.

## I.   LEGAL STANDARD

A motion pursuant to 28 U.S.C. § 2255 is the presumptive means by which a federal

prisoner can challenge his conviction or sentence.  *See Davis v. United States*, 417 U.S. 333, 343 (1974).  A court may grant relief from a federal conviction or sentence pursuant to § 2255 "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).  "Relief under this statute is available only in extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice."  *Blake v. United States*, 723 F.3d 870, 878-79 (7th Cir. 2013) (citing *Prewitt v. United States*, 83 F.3d 812, 816 (7th Cir. 1996); *Barnickel v. United States*, 113 F.3d 704, 705 (7th Cir. 1997)).

## II.  FACTUAL BACKGROUND

### A.  The Charges Against Burkhart

In 2015, the Health and Hospital Corporation of Marion County ("HHC") was the operator of approximately ninety nursing homes and long-term care facilities operated by an Indianapolis, Indiana-based family known as the Jacksons.  (Dkt. 2-1 ¶¶ 2-4.)  At all relevant times, the President and Chief Executive Officer ("CEO") of HHC was Matthew Gutwein ("Gutwein").  *Id.* ¶ 24.  HHC outsourced the management of the nursing facilities to American Senior Communities, LLC ("ASC"), a private management company.  *Id.* ¶ 5.  The Jackson family owned the majority interest in ASC.  *Id.* ¶ 6. Burkhart was the CEO of ASC.  *Id.* ¶ 7.

On October 4, 2016, Burkhart and three co-defendants were charged in a 32-count Indictment alleging that Burkhart, through his role as CEO of ASC orchestrated an extensive conspiracy to exploit ASC's operations for his and his co-defendants' personal gain. *United States v. Burkhart*, Case No. 1:16-cr-00212-TWP-TAB ("Crim. Dkt.") (Crim. Dkt. 1.) Specifically, the

Indictment alleged that for nearly six years Burkhart and his co-defendants concocted numerous schemes involving ASC's vendor relationships to funnel money to themselves from (a) ASC, HHC, and federal health care programs, and (b) kickbacks from vendors through a series of shell companies.  The Indictment reflected the alleged conspiracy in two counts: Count 1 alleged that all four defendants conspired to commit mail, wire, and health care fraud in violation of 18 U.S.C. § 1349, and Count 13 alleged that three of the defendants, including Burkhart, conspired to violate the federal health care program Anti-Kickback Statute in violation of 18 U.S.C. § 371 and 42 U.S.C. § 1320a-7b(b).  *Id.*  The Indictment included multiple substantive fraud and money laundering charges that reflected the way the conspiracy was carried out and how the defendants illegally disposed of proceeds of the conspiracy.  *Id.*  The Indictment also included a forfeiture count, alleging that Burkhart and his co-defendants' ill-gotten proceeds included dozens of bank accounts, over $500,000.00 in cash, real estate (including Burkhart's vacation property on Lake Wawasee, Indiana), gold bars, coins, and jewelry.  *Id*. at 31-34.

**B.**     **<u>Burkhart's Retention of Barnes and Thornburg</u>**

On September 15, 2015, law enforcement agents executed a search warrant at Burkhart's home.  (Dkt. 2-1 ¶ 15.)  While his home was being searched, Burkhart called an attorney with the law firm Faegre Baker Daniels LLP ("Faegre").  *Id.*  Two Faegre lawyers went to Burkhart's home but concluded that they could not represent him because of their firm's attorney-client relationship with HHC.  *Id.* ¶ 16.  The Faegre lawyers contacted Barnes & Thornburg LLP ("B&T") attorney Larry A. Mackey ("Mackey") on Burkhart's behalf.  *Id.* ¶ 17.  Burkhart signed an engagement letter with B&T on September 21, 2015.  (Dkt. 2-15.)  That letter did not disclose any attorney-client relationship with HHC.  *Id.*  Both the search warrant and subpoena served on Burkhart expressly mentioned HHC.  (Dkt. 2-12; Dkt. 2-13.)

B&T has served as a lobbyist for HHC since 2003.  (Dkt. 2-5; Dkt. 2-6; Dkt. 2-7.)  In addition, B&T has defended HHC in civil litigation.  *See United States ex rel. Black v. Health & Hosp. Corp. of Marion Cty*, No. 1:03-cv-01599-DFH-TAB ("*Black v. HHC*").  The plaintiff in that case accused HHC and Gutwein of lying to the federal government to increase payouts from the federal government under the Upper Payment Limit-InterGovernmental Transfer Program ("UPL-IGT").  Gutwein was alleged to have personally violated the False Claims Act by creating false or fraudulent records and claims. No one from B&T ever told Burkhart that they had represented HHC and Gutwein and publicly defended the integrity of the hospital and its officers.

 B&T also represented HHC in a civil case while it was representing Burkhart on criminal charges.  *See Jackson v. Health and Hosp. Corp. of Marion Cty.*, No. 1:16-cv-3072-RLY-MJD. The plaintiff in that case, HHC's former compliance auditor, alleged that she had been terminated from her employment in retaliation for trying to stop HHC from submitting false claims to the federal government and the State of Indiana.

On January 14, 2016, Burkhart initiated a civil lawsuit against FC Domino Acquisition, LLC and various other entities, commonly referred to as Formation Capital. Mackey convinced Burkhart to dismiss the case asserting that HHC was indemnifying the entities named in the lawsuit, and Gutwein was "tired of paying legal bills" in connection with this lawsuit.  (Dkt. 2-1 at 5-6.)  Neither Mackey nor any other B&T attorney discussed with Burkhart whether and how that civil lawsuit could expose deceptive activity engaged in by HHC and Gutwein.  Instead, B&T attorneys encouraged Burkhart to plead guilty, to "embrace HHC" and "something to the effect of" "you need to wrap your arms around" HHC, because HHC was a sympathetic victim.  *Id*. at 5. When discussing the potential cross-examination of Gutwein for the sentencing hearing, Mackey told Burkhart that during any cross-examination of Gutwein, the firm would need to use "kid

gloves." *Id.*

The jury trial for Burkhart and co-defendants Josh Burkhart and Dan Benson was scheduled for January 29, 2018. (Crim. Dkt. 114.) In November 2017, Burkhart's co-defendant and younger brother, Josh Burkhart, pled guilty and agreed to cooperate with the Government, including testifying against Burkhart at trial. (Crim. Dkt. 120, Crim. Dkt. 121.) On December 14, 2017, Burkhart's co-defendant and ASC's COO, Dan Benson, agreed to plead guilty. (Crim. Dkt. 134, Crim. Dkt. 136.) As Burkhart's trial date approached, the firm's lawyers encouraged Burkhart to plead guilty. The plea agreement called for Burkhart to forfeit assets of approximately $2,800,000.00, and to pay HHC over $3,000,000.00 in restitution. (Crim. Dkt. 143, Crim. Dkt. 344.) Burkhart agreed to plead guilty.

After being sentenced, Burkhart "heard" for the first time that B&T had performed lobbying work on behalf of HHC, after which he conducted research that confirmed this lobbying work. (Dkt. 2-1 at ¶ 34.) No one from B&T ever informed Burkhart that the firm was representing or had represented HHC. *Id.* at ¶ 35.

Other facts pertinent to Burkhart's claim will be discussed below.

### III. <u>DISCUSSION</u>

Burkhart seeks relief from his plea arguing that his attorneys operated under a conflict of interest that adversely affected his defense. He argues that B&T's conflict—its simultaneous representation of both accused and victim of accused—manifested itself clearly in three ways. First, B&T failed to pursue an obvious defense that Burkhart lacked the necessary *mens rea* because it would have had to cross-examine and potentially impeach its other client, HHC. (Dkt. 2 at 9.) If such a defense were ultimately successful, it would have "cost the hospital millions of dollars in lost restitution payments." *Id.* Second, "B&T failed to advise [him] of the availability

of powerful impeachment techniques against [HHC] ... [which] could have both destroyed [HHC]'s credibility as a victim-witness and implicated the hospital and its officers in dubious or potentially illegal financial schemes." *Id*. Instead, B&T's approach was to treat Gutwein with "kids gloves." Third, B&T advised him to dismiss a civil lawsuit against Formation Capital, thus eliminating impeachment evidence that would have exposed HHC and Gutwein's participation in fraud. Burkhart also contends that B&T improperly persuaded him to plead guilty, "knowing [HHC]'s interest in avoiding participation in a criminal trial where its own questionable practices might be exposed." *Id*.

In response, the Government contends no "actual conflict" existed and that Burkhart cannot prove that the strategies he claims B&T failed to pursue were "adverse effects" at all.  Rather, they argue that his co-conspirators pleading guilty and agreeing to testify against him, three mock juries that unanimously voted to convict Burkhart and a tape recording in which Burkhart "admitted his fraud in salacious detail" influenced B&T's advice.  (Dkt. 67 at 9).  The Court will first determine whether a conflict existed before turning to whether any dual representation adversely affected B&T's representation of Burkhart.

## A.   <u>Conflict of Interest Standard</u>

Under the Sixth Amendment, a criminal defendant has the right to effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)).  "This right includes the right to representation that is free from conflict of interest."  *Hall v. United States*, 371 F.3d 969, 973 (7th Cir. 2004) (internal quotation omitted). When a petitioner claims that his counsel was ineffective because of a conflict of interest, he may establish this claim either by demonstrating that "an actual conflict of interest adversely affected his lawyer's performance" or by showing that a potential conflict of interest led counsel to provide

objectively deficient representation that caused prejudice. *United States v. Grayson Enters., Inc.*, 950 F.3d 386, 389 (7th Cir. 2020).

Burkhart argues that B&T operated under an actual conflict of interest.  An "actual conflict" exists when counsel is "faced with a choice between advancing [its] own interests above those of [its] client." *Hall*, 371 F.3d at 973.  "[I]t is more than a 'mere theoretical division of loyalties.'" *Grayson Enterprises, Inc.*, 950 F.3d at 398-99 (internal quotation omitted).

An "actual conflict" claim does not require proof of prejudice, but rather requires proof that the attorney had an "actual conflict of interest," that "adversely affected his lawyer[s'] performance." *Hall*, 371 F.3d at 973 (citing *Culyer v. Sullivan*, 446 U.S. 335 (1980)).  An adverse effect exists if there is a "reasonable likelihood that ... counsel's performance would have been different had there been no conflict of interest." *Id*.  The defendant must show "specific instances where [its] attorney could have, and would have, done something different if that attorney had represented only one [party]." *Griffin v. McVicar*, 84 F.3d 880, 887 (7th Cir. 1996) (quoting *United States v. Cirrincione*, 780 F.2d 620, 630–31 (7th Cir. 1985)).  Prejudice is presumed if the defendant makes this showing. *Mickens v. Taylor*, 535 U.S. 162, 173 (2002); *Hall*, 371 F.3d at 973.

When assessing whether a conflict has adversely affected a lawyer's performance, the court asks a simple question: is there a "reasonable likelihood" that, absent the conflict, the defense "counsel's performance would have been different"? The reasonable likelihood standard is, at most, a preponderance of the evidence standard. *See Stoia v. United States*, 22 F.3d 766, 770 (7th Cir. 1994) (citing *Frazer v. United States*, 18 F.3d 778, 787 (9th Cir.1994)). Thus, Burkhart must show (A) that his lawyer had a "conflict" and (B) that this conflict "adversely affected" the lawyer's

performance. If he does so, he has proven an "actual conflict." *See United States v. Williams*, 902 F.3d 1328, 1333 (11th Cir. 2018).

**B.**   **Analysis**

Burkhart argues that because B&T had represented HHC before and during the time it represented him and because HHC was identified as a victim of his actions, it operated under an actual conflict of interest.  In particular, he contends "[a] lawyer cannot effectively represent, at the same time, both a criminal defendant and that defendant's victim" and in this case "fourteen of Mr. Burkhart's lawyers also represented his alleged victim." (Dkt. 73 at 4.)  Burkhart argues that "these fourteen lawyers with divided loyalties included lead attorney, Larry Mackey, who had previously represented the hospital and its CEO, Mr. Gutwein, in connection with a whistleblower lawsuit filed against them both." *Id.*

In response, the Government argues that B&T did not operate under an actual conflict because B&T's representation of HHC was not "substantially and particularly" related to Burkhart's case and B&T therefore was not "actively represent[ing] incompatible interests." *Grayson Enters., Inc.*, 950 F.3d at 398-99. (Dkt. 67 at 30-31).  The Government also contends there was no conflict because B&T "[d]isclosed its representation of HHC to Burkhart, and Burkhart never complained about it." *Id.*

The Government's arguments fail. Under the law, "for a defendant's waiver to be valid, the judge need only inform [the] defendant of the nature and importance of the right to conflict-free counsel and ensure that the defendant understands something of the consequences of a conflict." *United States v. Turner*, 594 F.3d 946, 952 n. 1 (7th Cir. 2010) (quoting *United States v. Flores*, 5 F.3d 1070, 1078 (7th Cir. 1993)); *United States v. Adkins*, 274 F.3d 444, 453 (7th Cir. 2001) ("A waiver is 'knowing and intelligent' if it is "made with sufficient awareness of the relevant

circumstances and likely consequences."). Even if B&T had disclosed its representation of HHC to Burkhart, that disclosure does not constitute a waiver. Here, the Court was never advised of a potential conflict, there was no judicial inquiry of Burkhart, and Burkhart never waived any conflict. More importantly, HHC was clearly treated as a victim of Burkhart's wrongdoing (*see* Crim. Dkt. 1 ¶ 17). The Court agrees with Burkhart that under these circumstances B&T clearly had a conflict in their representation. Therefore, the Court will proceed with an analysis of whether the conflict adversely affected his attorneys' performance.

Burkhart argues that B&T's performance was affected in four ways.

### 1.   *Mens Rea* **Defense**

Burkhart first argues that B&T's conflict caused it to fail to pursue a *mens rea* defense. The Government's theory of the case against Burkhart was that he failed to inform HHC about his financial interest in vendors with which it did business. According to Burkhart, the obvious defense was that he reasonably believed that he acted lawfully in not disclosing those interests and therefore lacked the requisite criminal intent. As the CEO of ASC, Burkhart was aware that the Jacksons had not disclosed their financial interests in certain vendors to HHC. (*See* Dkt. 2-1, ¶¶ 8-11.) He asserts that the management agreements between ASC and HHC obligated him to continue with "Past Management Practices," which involved the Jacksons using their own vendors to service their own nursing homes. (Dkt. 2-3 at 8-10; Dkt. 2-1, ¶ 13-14.) Burkhart argues that the key witness to presenting his *mens rea* defense should have been Gutwein, the CEO of HHC, who conceded during an interview with the Federal Bureau of Investigation ("FBI") that the Jacksons had not disclosed their financial interests in vendors to HHC. (Dkt. 2-4 at 6.)

The Government responds that B&T actually did prepare the *mens rea* defense and Burkhart admitted as much at his deposition. (Dkt. 67-3 at 33 (Burkhart Dep. at 125:10-23).) In

preparing for the possibility of trial, B&T included this defense in its draft opening statement, describing the Jacksons' interest in vendors and stating: "Mr. Burkhart never thought it was wrong, criminal, or improper for him to have interests in vendors that serviced ASC/HHC." (Dkt. 67-36 at 2, 13.) B&T also prepared to cross-examine Frank Jackson, one of the family members who owned ASC, about his family's ownership of ASC vendors. (Dkt. 67-66 at 20-29; *see also* Dkt. 67-3 at 30, (Burkhart Dep. at 114:14) (B&T "was preparing a *mens rea* defense that included proving that the Jacksons failed to disclose their ownership interests in certain vendors."). Specifically, in B&T's draft cross-examination outline for Frank Jackson, B&T planned to point to Frank Jackson's statement to Burkhart that ASC vendors were not "related part[ies]. There is no profitability there. We do not need to disclose anything. Don't worry about it." (Dkt. 67-2 at 27, Dkt. 67-22,  Dkt. 67-66.)  Further, B&T prepared a cross-examination outline of Gutwein that asked, "Did the Jacksons ever disclose to you that they owned Midwest Radiology [a vendor to HHC]?  Did they ever disclose to anyone that they owned Midwest Radiology?" (Dkt. 67-64 at 36.)

B&T also planned to submit evidence regarding a contract between ASC and HHC that referred to ASC continuing "past management practices," which B&T would use to prove that the Jacksons' practice of owning outside vendors justified Burkhart in thinking he could too, and therefore he lacked intent to defraud. (Dkt. 67-2 at 23-24; Dkt. 67-38.)  Burkhart admitted at his deposition that B&T "was preparing a defense that included proving to the jury that the past management practices clause allowed [him] to continue doing what the Jacksons were doing." (Dkt. 67-3 at 39).

B&T also intended to argue that it was a common industry practice for managers to have a financial interest in vendors.  Its draft opening statement stated: "it was perfectly reasonable for

Mr. Burkhart to think it was okay to own interests in vendors. He learned about this from the Jacksons and it was common in the industry." (Dkt. 67-36 at 16.) B&T prepared to cross-examine Gutwein on this point. (Dkt. 67-64 at 34, ("You are aware that ownership of ancillary vendors is common in the health care industry, correct?").)

Moreover, B&T prepared to address weaknesses in Burkhart's *mens rea* defense, such as having to confront recordings of Burkhart's conversations with co-conspirators, which included Burkhart saying:

> Everybody's just taking money from me. And they take it from my people too which pisses me off. But I'll get mine, I always told you I'll get mine one way or another. . . . You can f*** me but I'll get mine eventually. . . .
>
> I don't sit there and announce to [the Jacksons] what I'm doing,".… "I could include the [Jackson] family in a lot of things I'm doing now for side businesses but they f***ed me so guess what.

(Dkt. 67-55 at 58, 59, 60 (Tr. of Mazanowski Aug. 4, 2015 recording).) B&T prepared to mitigate the impact of these recordings on the jury by explaining that Burkhart's statements in these recordings should be understood in the context of his belief that he thought it was appropriate for him to own ASC vendors because the Jacksons did it, it was common in the industry, and he was acting as a contingent owner. (*See* Dkt. 67-137 (draft outline discussing arguments to rebut impact of Mazanowski recordings).)

The Government further argues that B&T tested the *mens rea* defense with three mock juries. For example, in his direct examination played for the mock jury, Burkhart testified:

> I was involved in many vendor operations and relationships with third parties. No one ever discussed whether this was legal or said we were doing anything wrong…. Everyone benefitted from these arrangements and HHC had agreed to the very same interlocking relationships with vendors that the Jackson[]s had in 2003.

(Dkt. 67-73 at 6; *see also* Dkt. 67-72 at 18 (Mock Jury Introduction) ("Burkhart did not believe he was doing anything illegal. Having a financial interest in vendors was common practice in the

industry . . . . The Jacksons were involved in a number of vendors servicing HHC nursing homes . . . . Jim Burkhart believed he was just doing the same thing [as] the Jacksons").)  The mock juries then discussed, among other things, "Defendants' ownership in vendors."  (Dkt. 67-77 at 2.)  As mock jury members discussed Burkhart's ownership in vendors, they noted what Burkhart now says his attorneys should have prepared to prove at trial, that "the Jacksons did similar things as Jim [who] [b]elieved it was okay because he had seen what the Jacksons did." (Dkt. 67-74 at 4 (notes of focus groups summarizing mock juror comments regarding Topic No. 1).)  B&T observed that this argument did gain some traction with focus group members.  Nevertheless, every single mock jury unanimously voted to convict Burkhart at the conclusion of the focus groups. (Dkt. 67-77 at 5.)

In sum, the record conclusively reflects that B&T thoroughly prepared a *mens rea* defense on Burkhart's behalf.  Burkhart has not shown that B&T's defense was adversely affected in this respect.

### 2.    Cross-examination of Gutwein

Burkhart next argues that B&T did not advise him about potentially impeaching Gutwein and that it prepared a "kid gloves" approach to Gutwein's cross-examination.

Burkhart first argues that if Gutwein had testified at trial that the Jacksons had disclosed their interests, B&T should have been prepared to impeach him with prior inconsistent statements he made to the FBI.  Burkhart suggests that such impeachment would have been troublesome for HHC because it would have placed it at risk of losing restitution payments and placed its CEO in an unfavorable light.  Burkhart argues that the adverse effect of B&T's conflict is reflected in B&T's draft cross-examination outline, which included a series of questions about the Jacksons' ownership interest in vendors but did not include a plan to impeach Gutwein with his statements

12

to the FBI.

The Government argues that B&T did plan to cross-examine Gutwein about Burkhart's *mens rea* defense.  (Dkt. 2-2 at 34.)  And B&T was prepared to cross-examine him with his prior statements on these issues to the FBI.  *Id.*  The outline contains several references to "[4/16/16 302 at [page]]," which is a reference to Gutwein's prior statements to the FBI.  (Dkt. 67-3 at 32, Burkhart Dep. at 120:7-17 ("I believe [302 is] probably referring to … the FBI interview with someone on that date."); Dkt. 67-136 (email stating "I read Gutwein's 302 more carefully"); Dkt. 67-138, p. 2 (email discussing Gutwein's 302).)[1]

Burkhart further argues that HHC and Gutwein had agreed to participate in a deceptive financial scheme in which HHC would pay artificially inflated rents to various landlords as an indirect way of paying Burkhart a so-called "put fee."  Burkhart explains that in 2015, HHC assumed the licenses to operate seventeen additional nursing home facilities.  To obtain the buildings for the nursing homes, HHC negotiated the leases with a company called Formation Capital.  As part of the lease negotiations, HHC asked that the leases contain an "out" clause for HHC, presumably to mitigate against the risk that HHC would lose federal funding.  HHC wanted a clause that would allow it to assign its rights and obligations under the lease to Burkhart.  Under this arrangement, if HHC wanted to get out of the business of operating the nursing homes, it could allow Burkhart to step in and take over the leases.  (Dkt. 2-26.)  Although the Put Agreement required HHC to pay Burkhart $850,000.00 for serving as the "puttee," *id.* ¶ 2, the actual fee was $4,950,000.00.  Instead of paying that "put fee" to Burkhart directly, HHC planned to pay Burkhart through Formation Capital.  Specifically, over the life of the leases, HHC would pay Formation

---

[1] Burkhart argues that to impeach Gutwein with his statements to the FBI, he would have had to call the FBI agent as a witness. But if Gutwein was a party to this interview, he could have been asked to testify about it. And Burkhart has not shown that B&T was not prepared to do just that based on its references to the 302 in the cross-examination outline.

Capital $4,100,000.00 in extra rent and Formation Capital would pay this money to Burkhart as consulting fees. (Dkt. 2-27 at 3.) Burkhart argues that this arrangement was deceptive and carried the risk that HHC would submit fraudulent cost reports to the State of Indiana.

Burkhart argues that B&T could have used this scheme to impeach Gutwein at trial. According to Burkhart, if Gutwein had testified inconsistently with his prior statements to the FBI, B&T could have impeached him under Federal Rule of Evidence 608(b) because his involvement in this scheme qualifies as a "specific instance of untruthful conduct" sufficient to attack his credibility. Burkhart also argues that B&T could have used this transaction to undermine HHC's claims of victimization and to point out HHC's bias against him. Burkhart contends that HHC had a financial interest in ensuring his conviction because it would provide a legal basis to refuse to pay the put fee. He argues that B&T did not advise him about such a strategy or include any questions in its cross-examination outline for Gutwein about funding put payments through inflated rent payments. Instead, the outline contains questions that suggest it was Formation Capital, not HHC, that was paying the put fee. (Dkt. 2-2 at 54.)

The Government argues that making Gutwein and HHC look like fraudsters was not a plausible alternative to the strategy actually pursued and would have hurt, not helped, Burkhart's defense. First, according to the Government, highlighting this alleged fraud would have implicated Burkhart in yet another fraud involving allegedly inflated invoicing. Burkhart was present when the transactions were drawn up. (Dkt. 67-3, p. 44, (Burkhart Dep. at 166:4-167:14).) Moreover, he personally could have benefitted from this arrangement through the $4.1 million consulting fee. *See id.* at 45 (Burkhart Dep. at 171:3-173:11) (stating he "stood to profit"). In fact, B&T explained, that its "defense team had been concerned pre-indictment and discussed with Mr. Burkhart that the government might charge Mr. Burkhart with one or more criminal offenses related to the put

transaction. Having avoided indictment on this issue, it was contrary to Mr. Burkhart's interests to suggest the government should reconsider that decision." (Dkt. 67-2 at 37.)

Moreover, the Government points out that attacking Gutwein's credibility in this way would have undermined Burkhart's *mens rea* defense. As discussed above, Burkhart identifies Gutwein as "the key witness to presenting [his] *mens rea* defense" because he could testify that the Jacksons did not disclose their interests in ASC vendors to HHC. (Dkt. 2 at 35-38.) Undermining his credibility by arguing that he participated in a fraudulent transaction would have thwarted Burkhart's stated goal of putting on his defense through Gutwein.

Here, the record conclusively reflects that B&T prepared to cross-examine Gutwein regarding Burkhart's *mens rea* defense, including through Gutwein's interview with the FBI if necessary. The record also shows that presenting evidence regarding the Put Arrangement was not a plausible alternative to the defense B&T intended to pursue because Burkhart himself participated in the arrangement and stood to receive $4.1 million as a result. *See Grayson Enters.*, 950 F.3d at 399. Bringing this up at trial would have implicated Burkhart in another potentially fraudulent transaction. Further, attacking Gutwein's credibility with evidence of the Put Arrangement could have undermined Burkhart's strategy to elicit testimony about his *mens rea* defense through Gutwein. Burkhart thus has not shown that B&T was adversely affected in this respect.

### 3.   Civil Lawsuit

Next, Burkhart argues that B&T's conflict caused it to advise him to drop a civil lawsuit against Formation Capital that would have exposed HHC's and Gutwein's involvement in the put arrangement discussed above.

After Burkhart was arrested, Formation Capital and HHC executed new leases that reduced

the aggregate rent on the buildings by $4.1 million.  Formation Capital then refused to make any payments to Burkhart under the consulting agreement.  Burkhart, represented by B&T, sued Formation Capital for breach of contract.  *See JACCD, LLC v. FC Domino Acquisition, LLC*, 29C01-1601-CC-000344 (Hamilton Cty. Cir. Ct. Jan. 14, 2016), (Dkt 2-41). B&T advised Burkhart to drop the lawsuit, stating that he should do so because HHC had previously agreed to indemnify Formation Capital in connection with it.  (Dkt. 2-28 at 2 ("Given the indemnification clause between HHC and Formation, if we press our lawsuit against Formation, in essence we will be asking HHC to pay you. That is not a good tact to take in my view at this moment.").)  When further discussing this issue with Burkhart, counsel told him that Gutwein was "tired of paying legal bills" in connection with the lawsuit.  (Dkt. 2-1 at 6.)  Based on this advice, Burkhart dropped his lawsuit.  Burkhart argues that the premise of this advice was false because HHC was not paying legal fees.  Instead, ASC was paying them. (Dkt. 2-43.) Burkhart also argues that dropping the lawsuit was not in his best interest because it prevented him from developing evidence with which he could have impeached HHC and Gutwein.

The Government argues calling HHC a fraudster for allegedly planning to funnel $4.1 million through Formation Capital to Burkhart was not a "plausible" strategy because it made Burkhart look more guilty.  The Government contends that Burkhart's lawsuit against Formation Capital was not required in order for them to pursue discovery from those parties.  B&T could, and did, issue fifty-eight trial subpoenas, (Crim. Dkt. 73 at 5 n. 6), one of which was issued to Formation Capital (*see* Dkt. 67-144). And with regard to HHC, B&T used public records requests to obtain discovery.  (*See* Dkt. 67-29.)  While Burkhart argues that further discovery could have been taken in the form of interrogatories, requests for admission, and the deposition of Gutwein, he has not shown what evidence could have been discovered this way that could not have been

16

discovered through the other avenues in which discovery was obtained in his criminal case. In addition, as B&T advised Burkhart at the time, Formation Capital may have taken discovery from Burkhart, including a sworn deposition, which could have been used against him in the criminal case. (Dkt. 2-1 at 38-39.) Further, suing Formation Capital and exposing HHC's alleged "fraud" ran counter to B&T's pre-indictment strategy, which Burkhart agreed with, of trying to reach civil settlements with HHC and ASC and then pitch to the Government that it should not criminally charge Burkhart because everyone had been made whole. *Id*. at 39.

Here, Burkhart has not shown that B&T's advice to drop the lawsuit against Formation Capital had an adverse effect on his defense. First, as the Court has already concluded, addressing the put fee arrangement at trial would likely have harmed his defense because he is necessarily implicated in the potentially fraudulent transaction. In addition, while Burkhart argues that B&T could have obtained discovery in the course of the civil lawsuit that it could not have obtained in his criminal case, B&T had ample discovery mechanisms at its disposal and took advantage of them.

### 4.      Advice to Plead Guilty

Finally, Burkhart argues that B&T advised him to plead guilty because HHC did not want to go to trial. According to Burkhart, if he had gone to trial, HHC potentially stood to lose millions of dollars in restitution if he was acquitted. HHC would also suffer from the potential exposure of the Formation Capital put arrangement. Burkhart also argues that a trial might have brought attention to whether HHC had abused the UPL-IGT program.

Burkhart explains that the UPL-IGT program is intended to help government-run hospitals avoid losses when they service persons covered by Medicaid. He asserts that he was prepared to demonstrate at trial that because HHC ran such a fiscally efficient long-term care operation

between 2003 and 2015, it was technically ineligible for the UPL-IGT program, but nonetheless collected hundreds of millions of dollars from the government in UPL-IGT reimbursement. Burkhart also states that after he was sentenced, Mackey met with him and referred to HHC's participation in the UPL-IGT program as a "scam." (Dkt. 2-1 at 6.) Mackey also acknowledged that HHC "wanted to avoid a trial" because it would have resulted in increased scrutiny regarding the program. *Id*. at 6-7. Mackey then noted that he was "glad" that HHC's "exposure" had gone away. *Id*. at 7.

The Government argues that B&T's advice regarding Burkhart's guilty plea was based on the overwhelming evidence of Burkhart's guilt and the harsher sentence he would face if he were convicted following trial. Burkhart was on videotape describing how his scheme worked: inflated invoices, a shell company with a name like the vendor, and using Steven Ganote to "insulate" himself. (*See* Crim. Dkt. 215-3 at 2.) A co-conspirator in one of his secret vendor side deals, David Mazanowski, was prepared to testify against him. The Government had seized binders that contained copies of inflated invoices and post-it notes of how proceeds would be split.

In preparation for a potential trial, B&T conducted three mock jury trials and in each mock trial, the juries unanimously convicted Burkhart. The mock trials occurred before ASC's Chief Operating Office ("COO") and Burkhart's brother agreed to testify against him. (Dkt. 67-77 at 5; Dkt. 67-80 (noting "Secret recordings are huge issue.").) Based on the facts they heard, the mock jurors afforded Burkhart little "sympathy" and felt far higher levels of "anger" and "disgust" towards him, describing him as "manipulative," "crook," "sneaky," "thief," and "greedy." (Dkt. 67-78 at 2-4.)

On the eve of Burkhart's trial date, ASC's COO, Burkhart's younger brother, and the final co-conspirator, Steven Ganote, filed plea agreements and each agreed to cooperate with the

Government.  (Dkt. 67-2 at 41.)  B&T knew that each would implicate Burkhart as the ringleader in the various secret vendor side deals they were a part of.  (Dkt. 67-2 at 41-42, 44; Dkt. 67-94; Dkt 67-95.)  After pleading guilty, at an offense level 32, Burkhart's advisory Sentencing Guidelines range was 121-151 months in prison.  And, the Court sentenced him below the advisory guideline range to 114 months, in part because of the "remorse" he showed at sentencing.  (Crim. Dkt. 273 (Sent. Hr. Tr. at 201:3-9).)  If Burkhart had been convicted (of the three counts to which he pled guilty) following a trial, his offense level would have been at least 35, because he would have lost a 3-level reduction for acceptance of responsibility, U.S.S.G. § 3E1.1, increasing his advisory Guideline range to at least 168-210 months in prison, U.S.S.G. § 5A (sentencing table). B&T knew this, and they talked at length with Burkhart about it.  (Dkt. 67-2 at 42-43; Dkt. 67-110; *see also* Dkt. 67-96 at 3-4. 47.)

Burkhart thus has not shown that B&T's negotiation of the plea agreement was adversely affected by its relationship with HHC.  Burkhart was charged in thirty-two counts.  Pursuant to the terms of his plea agreement, he pled guilty to only three counts – Count 1: Conspiracy to Commit Mail, Wire and Healthcare Fraud, Count 13: Conspiracy to Violate the Anti-Kickback Statute, and Count 15: Money Laundering.  (Crim. Dkt. 143 at 1.)  In consideration of his plea of guilty, the Government agreed to dismiss Counts 2, 3, 4, 5, 6, 7, 9, 10, 11, 17, 18, 19, 20, 21, 29, 31, and 32. *Id*. at 3.  Moreover, the final plea agreement included not only concessions from the Government in the Factual Basis, (Dkt. 67-107), but it also gave Burkhart the ability to argue at sentencing for a lower Guidelines range (Crim. Dkt. 143 ¶¶ 26, 27, 28, 30). This included the ability to argue for a significantly lower loss amount (and restitution amount) than the Government was contending. (Crim. Dkt. No. 143 ¶ 26.)  By seeking the ability to argue for a lower loss amount, B&T was able to argue that Burkhart would owe less to HHC in restitution.

Next, at sentencing, B&T presented a loss chart which advocated that Burkhart was responsible for less than $4 million in total losses (Crim. Dkt. 218 at 2, 9-15) as opposed to the Government's position that Burkhart was responsible for over $19 million in total losses, of which HHC bore nearly $10 million (Crim. Dkt. 215 at 27-33; 215-4).   In addition, B&T sought to temper any victim impact statement HHC and its CEO, Gutwein, might make to the Court by arranging for Burkhart to meet personally with Gutwein and apologize, a tactic Burkhart agreed with.  (Dkt. 67-123.)

In sum, the record conclusively reflects that B&T's advice to Burkhart to plead guilty was based on the evidence against him, including the very damaging recorded conversations and potential testimony of his co-defendants who had already pled guilty.  This is supported by the fact that three mock juries consistently convicted him.  After Burkhart pled guilty, B&T sought lower sentencing guideline calculations and a lower restitution amount.  And the Court was persuaded by B&T's arguments made at sentencing. In these circumstances, Burkhart has failed to show that B&T's relationship with HHC adversely affected his defense.

## IV.   EVIDENTIARY HEARING

"Not every petitioner who seeks relief pursuant to § 2255 is entitled to an evidentiary hearing." *Boulb v. United States*, 818 F.3d 334, 339 (7th Cir. 2016) (citing *Cooper v. United States*, 378 F.3d 638, 641–42 (7th Cir. 2004)).  A hearing is unnecessary when "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief."  28 U.S.C. § 2255(b).  That is the case here.  There are no genuine disputes of fact, and the record shows that B&T's representation of Burkhart was not adversely affected by its relationship with HHC. Accordingly, Burkhart's Motion for an evidentiary hearing is **denied**.

## V.   CONCLUSION

For the reasons explained in this Order, James Burkhart is not entitled to relief on his § 2255 motion.  There was no ineffective assistance of counsel.  Accordingly, his Motion for relief pursuant to § 2255 (Dkt. 1) is **DENIED** and this action is **dismissed with prejudice**.  In addition, Burkhart's Motion for Evidentiary Hearing (Dkt. 3) is also **DENIED**.  Judgment consistent with this Entry shall now issue and the **Clerk shall docket a copy of this Entry in Case No. 1:16-cr-00212-TWP-TAB-1.** The Motion to Vacate, (Dkt. 366), shall also be **terminated** in the underlying criminal action.

## VI.   CERTIFICATE OF APPEALABILITY

A habeas petitioner does not have the absolute right to appeal a district court's denial of his habeas petition, rather, he must first request a certificate of appealability. *See Miller–El v. Cockrell*, 537 U.S. 322, 335 (2003); *Peterson v. Douma*, 751 F.3d 524, 528 (7th Cir. 2014).  Pursuant to Federal Rule of Appellate Procedure 22(b), Rule 11(a) of the Rules Governing § 2255 proceedings, and 28 U.S.C. § 2253(c), the Court finds that reasonable jurists might find "it debatable whether the petition states a valid claim of the denial of a constitutional right".  *Slack v. McDaniel,* 529 U.S. 473, 484 (2000).  The Court therefore **GRANTS** a certificate of appealability.

SO ORDERED.

Date:  5/12/2021

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

21

DISTRIBUTION:

Bradley J. Wombles
NORRIS CHOPLIN & SCHROEDER
bwombles@ncs-law.com

Peter A. Schroeder
NORRIS CHOPLIN & SCHROEDER
pschroeder@ncs-law.com

John R. Byrne
LEON COSGROVE, LLP
jbyrne@leoncosgrove.com

Jordi C. Martinez-Cid
LEON COSGROVE, LLP
jmartinez-cid@leoncosgrove.com

Justin R. Olson
UNITED STATES ATTORNEY'S OFFICE
justin.olson2@usdoj.gov

Nicholas J. Linder
UNITED STATES ATTORNEY'S OFFICE
nick.linder@usdoj.gov

Donald Robert Lundberg
LUNDBERG LEGAL
don@lundberglegal.com